SCOTT ERIK ASPHAUG, OSB #833674
United States Attorney
District of Oregon
**RYAN W. BOUNDS, OSB #00012**
Ryan.Bounds@usdoj.gov
**CHRISTOPHER L. CARDANI**
Christopher.Cardani@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:20-cr-00228-SI-001 |
| v. | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR BILL OF PARTICULARS** |
| **ROBERT J. JESENIK, N. SCOTT GILLIS, ANDREW N. MacRITCHIE, AND BRIAN K. RICE,** | |
| **Defendants.** | |

Defendant Robert Jesenik, with co-defendant Andrew MacRitchie, moves this Court for an order directing the government to file a bill of particulars "specif[ying] the investments at issue in Counts 1-20 of the Indictment" and "identify[ing] the specific duty Mr. Jesenik had to disclose information about Aequitas'[s] financial situation." (ECF No. 108 [hereinafter "Def. Mot."] at 1.) The motion should be denied, because the Indictment and discovery the government has already produced to defendants abundantly detail the nature of the charges in this case. The motion is also untimely.

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars**  Page 1

I.  **BACKGROUND**

The government's disclosures to defendants about its theory of the case and the precise nature of the fraud at issue, as well as the evidence of it, began even before defendants were charged. As part of early settlement negotiations, counsel for the government and federal agents met with counsel for both movants and ultimately with the movants themselves. During those meetings, which began with defendant MacRitchie's counsel in May 2020 and defendant Jesenik's counsel in October 2020, counsel for the government presented 80-page slide decks broadly outlining the government's anticipated case at trial and highlighting many of the most salient documents supporting the prosecution.

Those presentations made clear that the government's criminal case centered on defendants' false and misleading statements, omissions, and pretenses in the wake of Corinthian Colleges, Inc.'s June 2014 default on its recourse obligations to Aequitas in relation to hundreds of millions of dollars in student debt that Aequitas held. The statements, omissions, and pretenses at issue had falsely indicated that Aequitas's financial soundness was not materially affected by Corinthian's default and that new investor moneys would continue to be directed to the purchase of trade receivables when, in fact, incoming investor moneys would be predominantly and necessarily used to redeem earlier Aequitas investors and to defray Aequitas's extravagant operating expenses.

a. **The Allegations in the Indictment**

The same theory is plain on the face of the 34-count Indictment. The first twenty counts—the only ones at issue in the pending motion—charged defendants with conspiracy to commit mail and wire fraud and nineteen substantive counts of wire fraud between June 2014 and Aequitas's collapse in February 2016. (ECF No. 1 ¶ 10.) Paragraphs ten through twenty-

eight of the Indictment describe the underlying fraud scheme: During the period charged, defendants solicited victims to invest hundreds of millions of dollars in notes and funds that purportedly funded the acquisition of, and were thus "backed by[,] trade receivables in education, health care, transportation, and other consumer credit areas" but instead were overwhelmingly used "to pay [Aequitas's] operating costs and to repay other investors." (*Id.* ¶¶ 12, 17, 21.)

Defendants hid the diversion of investors' moneys in part by allowing Aequitas's parent company, Aequitas Holdings, LLC ("Holdings"), to borrow those moneys from Aequitas Commercial Finance LLC ("ACF"), which issued the notes or controlled the investment funds in which the victims invested. The moneys ACF lent to Holdings were consolidated and concealed in the so-called "Holdings Note," a "woefully under-collateralized" obligation that was highly unlikely ever to be repaid. (*Id.* ¶ 18.) Defendants concealed the existence and dubious value of the Holdings Note by misleadingly reflecting it on ACF's books as an "asset"—benignly described in marketing materials as corporate debt—that was purportedly worth the face-value of the loan.[1] (*Id.* ¶¶ 18, 48.)

In sum and substance, the scheme to defraud described in the Indictment is a typical Ponzi scheme: Investors were led to expect solid returns from the company's purported investments in trade receivables, but their moneys were actually used to fund operating expenses and to repay earlier investors—and their own returns could be funded only by later investments. As observers of Ponzi schemes would expect, and as the Indictment alleges, defendants never

///

---

[1] As the Indictment explains, Aequitas acknowledged the Holdings Note was actually worth less than half its face value—but only once (for the purposes of defrauding Wells Fargo Bank) and never on the ACF financial statements disclosed to outsiders. (ECF No. 1 ¶ 48.)

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 3**

disclosed these facts to their investors or to Aequitas's own accountants and lawyers. (*Id.* ¶¶ 15, 24.)

The Indictment enumerates nineteen individual wire transmissions that defendants caused "for purposes of attempting to execute and executing" this scheme. (*Id.* ¶ 28.) Eleven of them are incoming wire transfers of investor funds: seven to "ACF Private Note" accounts, and four to "IOF II" accounts. (*Id.*) The ten remaining wire transmissions comprise defendants' email communications about investor redemptions and the real and purported uses of investor moneys. Each one of the emails is identified by date and subject. All of them identify the investors—and, by extrapolation, the particular Aequitas investment funds—in question.

### b. Additional Details Available in Discovery

In addition to the details expressly alleged or referenced in the Indictment itself, the government has made additional details about the fraud scheme available to defendants through its expansive approach to discovery. The government has routinely produced or made available to defendants all the evidence it has collected over the course of its ongoing investigation and will continue to do so on a rolling basis. The government's production includes documents collected from victim investors, former employees of the company (including cooperating defendants), investment-advisors who marketed Aequitas investments, and other sources. In addition, the government has worked with defendants, Aequitas's Receiver, and the Court to ensure that defendants have had the same access to company documents and records that the government has had. (ECF No. 63.)

The government's investigation has also included more than 150 interviews of victim-investors, Aequitas employees, and others with relevant information about defendants' conduct. Each substantive witness interview has been summarized in a report prepared by federal agents

or recorded and transcribed. Those reports and recordings either attach or reference by bates number the documents that agents or prosecutors discussed with the witnesses during the interviews.

The documents collected and interviews conducted by the government give both a comprehensive and a granular view of the fraud and material misstatements, omissions, and pretenses at issue in this case. The investors and investment-advisors who were interviewed typically identified the investments in which they were involved and described what defendants and their subordinates led them to believe about how Aequitas would use their investments. Those witnesses also identified what documents and statements, where possible, they relied upon in forming their beliefs. Former Aequitas treasury and accounting personnel described how investor moneys were used and accounted for, and former marketing and investment-relations personnel described which materials were sent to which investors or investment-advisors. The government produced nearly all the above-described documents, interview reports, recordings, and transcripts to defendants, with detailed indices, by June 10, 2021.[2]

### c. The SEC Action and Receiver's Report

Like the government, defendants also have the benefit of the findings and conclusions of Aequitas's Receiver, who assumed operational control of the company in March 2016. This Court appointed the Receiver in conjunction with a civil action filed by the Securities and Exchange Commission ("SEC"). *See In re Aequitas Mgmt., LLC, et al.,* Case No. 3:16-cv-00438-JR [hereinafter "*SEC Case*"], ECF Nos. 30, 156. Pursuant to that appointment, the

/ / /

---

[2] The government's production to date does not include transcripts of four interviews that have not yet been transcribed, reports or recordings of interviews conducted in recent weeks, or documents and recordings obtained through the cooperation of foreign governments (which await translation).

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 5**

Receiver was authorized "to investigate the manner in which the financial and business affairs of [Aequitas] were conducted." *Id.* ECF No. 663 at 7.

Following his investigation, the Receiver prepared and filed a 137-page report, accompanied by 35 pages of exhibits, on November 21, 2018. *Id.* That report detailed the Receiver's forensic accounting of Aequitas's use of investor moneys and his conclusion that Aequitas was "insolvent from at least July 3, 2014" and "dependent on continued infusion of new Investor money to pay operating expenses and returns to Investors." *Id.* at 10. He ultimately concluded that Aequitas operated during the period charged in the Indictment as "an orchestrated and sprawling Ponzi scheme." *SEC Case*, ECF No. 787 at 19. In other words, the Receiver's Report and subsequent filings recount in painstaking detail the financial information that defendants were concealing from Aequitas's investors, lawyers, and accountants.

### d. Timing and Procedural Posture

Defendant Jesenik was arraigned on the Indictment on August 17, 2020, and defendant MacRitchie was arraigned on September 23, 2020 (ECF No. 19, 52.) The Court ultimately scheduled the five-week trial in this matter to begin on April 3, 2023. (ECF No. 70.)

On February 24, 2021, the government filed the parties' Stipulated Pretrial Schedule, and this Court entered an order adopting that schedule two days later. (ECF Nos. 73, 74.) The order did not address the filing of motions for bills of particulars, but it did specify that the government's exhibit list is due by September 16, 2022, and its witness list is due by November 7, 2022—nearly five months before trial. (ECF No. 74.)

///

///

///

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 6**

## II. A BILL OF PARTICULARS IS UNWARRANTED IN THIS CASE

### a. Standards

The Federal Rules of Criminal Procedure provide that an indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Consistent with that standard, the Ninth Circuit has held that an indictment fulfills its purpose so long as it "set[s] forth the elements of the offense charged" and "contain[s] a statement of the facts and circumstances that will inform the accused of the specific offense with which he is charged." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979); *see United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004).

Where an indictment does not satisfy these standards, a defendant "may move for a bill of particulars," though he must do so "before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f).[3] The purpose of a bill of particulars is to inform defendants of the nature of the charges against them with sufficient precision to enable them to prepare for trial; to avoid or minimize the danger of surprise at the time of trial; and to ensure the right not to be placed in double jeopardy. *See United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991); *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984); *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983).

Whether to order a bill of particulars is a decision left to the trial court's discretion. *See id.* "In determining if a bill of particulars should be ordered in a specific case, a court should consider whether the defendant has been advised adequately of the charges through the

///

---

[3] The instant motion was filed more than a year after movants' arraignments, and the Court's scheduling order did not extend the time for filing motions for bills of particulars. Accordingly, defendants' motion should be denied at least in part for its conspicuous untimeliness.

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 7**

indictment and all other disclosures made by the government." *Long*, 706 F.2d at 1054. The Court should also weigh defendant's asserted need for additional information against the restrictive effect a bill of particulars will have on the government's case. Once a bill of particulars is filed, it confines the government's evidence to the particulars furnished. *United States v. Haskins*, 345 F.2d 111, 114 (6th Cir. 1965).

As this Court has repeatedly held, "[a] bill of particulars is *not* necessary if 'the indictment itself provides sufficient details of the charges and if the government provides full discovery to the defense.'" *United States v. Lund*, 127 A.F.T.R.2d 2021-2273, 2021 WL 2321670, at *4 (D. Or. June 7, 2021) (quoting *Mitchell*, 744 F.2d at 705) (emphasis added) (denying motion for bill of particulars).[4]

### b. Discussion

Defendants do not dispute that the government has afforded them thorough discovery. To the contrary, they characterize the governments' production as "massive." (Def. Mot. at 5; *id.* at 11 (noting "the government's production alone supplied 2 million documents totaling 8.7 million pages of discovery").) Although defendants suggest that the very comprehensiveness of the government's discovery "should" militate *for* a bill of particulars (Def. Mot. at 4), that claim is inconsistent both with the purposes of a bill of particulars and with the precedents of both the Ninth Circuit and this Court. *See, e.g., Lund*, 2021 WL 2321670, at *4.

The only issue, therefore, is whether defendants have received adequate notice of the charges. (*Id*. at 6.) They protest two deficiencies in the Indictment: (1) it "does not name the specific investments that comprise the alleged investment fraud" among twenty-one different

---

[4] *See also United States v. Cramer*, Nos. 3:17-cr-267-SI and -271-SI, 2019 WL 1048830, at *8 (D. Or. Mar. 5, 2019) (same); *United States v. Heine*, No. 3:15-cr-238-SI, 2017 WL 1345220, at *10 (D. Or. Apr. 7, 2017) (same).

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 8**

investments reportedly marketed by Aequitas during the charged period (*id.* at 6); and (2) it fails to describe the "particular duty" that defendant Jesenik owed to "investors, RIAs, lawyers, accountants/auditors, and the public" to disclose that he was, to borrow the Receiver's blunt assessment, running a Ponzi scheme (*id.* at 10).

Defendants' complaints are misplaced. With respect to identifying the investments at issue, the Indictment repeatedly makes clear that the alleged fraud involved soliciting investments in funds that were "purportedly backed by trade receivables in education, health care, transportation, and other consumer credit areas" but from which investor moneys were in fact diverted to redeeming earlier investments and paying operating expenses. (ECF No. 1 ¶¶ 5, 12.) Indeed, the Indictment refers to defendants' cultivating the misimpression that investor moneys would go toward investments in "trade receivables" five separate times. (*Id.* ¶¶ 5, 12, 15, 17, 24.) In addition, the individual wires alleged in Counts 2 through 20 of the Indictment specifically identify the transfers of investor moneys into two such investments, "ACF Private Note" and "IOF II" (i.e., Income Opportunity Fund II, LLC), and specifically identify email communications about the real and purported uses of named investors' moneys. (*Id.* ¶ 28.) Defendants are simply incorrect in asserting that there is ambiguity about the relevant investments. If the investments involved the essential characteristics of the fraud as charged, the fact that they may have had different names and "managers, collateral rights, sufficiency of collateral coverage, investment strategies, plans of distributions, fees, disclosures of conflicts of interests, affiliate lending, or the use of senior lenders" (Def. Mot. at 7) is entirely beside the point.[5]

///

---

[5] Defendants emphasize that the various investments marketed by Aequitas "contained different terms" as well as "risks assumed by the purchasers when they subscribed" (Def. Mot. at 7), but

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 9**

Similarly unavailing is defendants' insistence that the Indictment must allege defendant Jesenik's "particular duty" to disclose the true facts of the Aequitas fraud scheme to victim investors and others. (Def. Mot. at 5, 10 (citing *United States v. Shields*, 844 F.3d 819 (9th Cir. 2016).) Defendants are charged with a scheme to defraud that they executed in part by concealing material facts from Aequitas's investors, lawyers, and accountants, but defendants' liability explicitly derives from antecedent "material misrepresentations about the uses of investor money, the financial health and strength of Aequitas, Aequitas's investments and investment strategies, and the inherent risks of those investments and investment strategies." (ECF No. 1 ¶ 13.) In other words, defendants are not charged with soliciting funds through truthful but incomplete statements; they are charged with misrepresenting material facts, which they accomplished in part by concealing and omitting the truth.

In such circumstances, no special "duty" to the victims is required. As the Ninth Circuit recently clarified:

> In cases of wire fraud *premised* on a material omission, the district court must instruct the jury that to convict the defendant, it must find the defendant had an independent duty to the defrauded party to disclose the omitted information. *See Shields*, 844 F.3d at 822-23. But in fraud cases premised on misrepresentations, including those that involve half-truths, the government is not required to prove such a duty."

*United States v. Farrace*, 805 F. App'x 470, 473 (9th Cir. 2020) (citing *United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015); *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986)) (emphasis added).

Even if a special duty were required, the Indictment plainly alleges that defendants communicated what were, at best, "half-truths" about Aequitas's finances and investments and

---

this is not a securities fraud case. The indictment alleges a scheme to defraud investors by lying to them. This is not a risk that criminal law supposes to be "assumed" in any context.

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 10**

about investors' security in Aequitas's portfolios of trade receivables. "[I]n a case involving half-truths, the duty to disclose arises from the truth half-spoken, not from a separate duty." *United States v. Stewart*, 728 F. App'x 651, 654 (9th Cir. 2018) (citing *United States v. Lloyd*, 807 F.3d 1128, 1153 (9th Cir. 2015)).

Either way, the Indictment provides defendants ample notice of the government's theory of the role the alleged omissions played in perpetrating the fraud. And no further facts are required to establish defendants' liability for those omissions within the broader web of lies and deceit the Indictment describes. Accordingly, no bill of particulars describing such facts is warranted.

None of the cases cited by defendants can sustain a contrary conclusion. Indeed, one of those authorities is wholly inapposite. Defendants repeatedly cite *Will v. United States*, 389 U.S. 90 (1967), for the proposition that this case's "complexity" supports their request for the desired bill of particulars (Def. Mot. at 4, 10), but that case nowhere evaluates the merits of ordering such a bill. The Court's analysis is limited to the appropriateness of a *writ of mandamus* to remedy the trial court's order, which was purportedly issued "pursuant to a deliberately adopted policy in disregard of the rules of criminal procedure." *Id.* at 100. The sole reference to the "complex nature" of the case in *Will* was offered simply to demonstrate that a requirement to identify the individuals who heard defendant's statements hardly constituted an order to compel disclosure of the prosecution's trial witnesses, as the government claimed. *See id.*

Defendants also repeatedly cite *United States v. Yim*, No. CR11-131MJP, 2011 U.S. Dist. LEXIS 1452 (W.D. Wash. Dec. 12, 2011), for the proposition that this case's "complexity" and "duration of the alleged conspiracy" merit a bill of particulars. (Def. Mot. at 10-11.) The trial judge's order in that case—comprising less than a page of dual-column text and limited

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars     Page 11**

analysis—offers no such support. The *Yim* Court makes clear (unremarkably) that a bill of particulars was required "to specify the duration of the conspiracy" because that datum went wholly omitted from the second superseding indictment. *Yim*, 2011 U.S. Dist. LEXIS 1452 at *3. That circumstance obviously does not obtain here. (ECF No. 1 ¶¶ 10, 30, 53 (alleging beginning and end dates of charged conspiracies).)[6] The court also directed the government to disclose the financial transactions conducted in furtherance of the alleged money laundering conspiracy (which were expressly alleged to have occurred yet nowhere identified), but the Indictment in the case at bar charges dozens of specific wires and financial transactions in furtherance of the charged conspiracies. (ECF No. 1 ¶¶ 28, 35, 48-50.)

    Defendants cite several cases in support of their contention that the scale of the government's discovery alone militates for a bill of particulars (Def. Mot. at 4), but none of those cases seem to have involved circumstances in which the prosecution had been ordered to turn over its exhibit and witness lists nearly half a year before trial. *See United States v. Bazezew*, 783 F. Supp. 2d 160, 168 (D.D.C. 2011) (granting bill of particulars identifying overt acts and co-conspirators but noting "defendant is not entitled to know all the evidence the government will use against him at trial . . . ."); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 244 (S.D.N.Y. 2000) (granting motion for bill of particulars but denying motion for government's witness list six months before anticipated trial date, noting that "[s]uch information clearly extends *beyond* what is required for the Defendants to be able to prepare a defense" (emphasis added)); *United States v. Nachamie*, 91 F. Supp. 2d, 565, 580 (S.D.N.Y. 2000) (granting motion

---

[6] Defendants also cite *United States v. Kahale*, 789 F. Supp. 2d 359 (E.D.N.Y. 2009), for the proposition that the conspiracy's duration "favors a bill of particulars" (Def. Mot. at 11), but the court in that case emphasized that the charged conspiracy was "five years"—thrice as long as those at issue here—and spanned the North American continent in concluding that unindicted coconspirators should be identified. *Kahale*, 789 F. Supp. 2d at 372.

**Government's Response in Opp'n to Defendants' Motion for Bill of Particulars    Page 12**

for bill of particulars but noting government's production of witness list "*fourteen days* before trial . . . w[ould] give defendants sufficient time to prepare" (emphasis added)).

Where, as here, defendants are charged by an indictment detailing their offenses and can expect a thorough accounting of the government's trial evidence many months before trial, no bill of particulars is plausibly necessary "to provide sufficient notice so that the defendant may prepare for trial" or "to avoid the danger of surprise at trial." (Def. Mot. at 3 (citing *Ayers*, 824 F.2d at 1483 (9th Cir. 1991).)

### III. CONCLUSION

For the foregoing reasons, defendants' Motion for Bill of Particulars (ECF No. 108) should be denied.

Dated: January 28, 2022

Respectfully submitted,

SCOTT ERIK ASPHAUG
United States Attorney

/s/ *Ryan Wesley Bounds*

_____
RYAN W. BOUNDS, OSB #00012
CHRISTOPHER L. CARDANI
Assistant United States Attorneys